IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA



```
___ FILED        ___ RECEIVED
___ ENTERED      ___ SERVED ON
         COUNSEL/PARTIES OF RECORD

           OCT 23 2020

       CLERK US DISTRICT COURT
         DISTRICT OF NEVADA
    BY
```

WILLIAMSON PENN LITTLE

Plaintiff,

vs.

(1) TIERRA LAYNE BAER-WARNDAHL;
(2) WESLEY DAY, MD

Defendant(s)

2:20-cv-01964-APG-NJK

JURY TRIAL DEMANDED

## CIVIL COMPLAINT FOR FRAUD, FRAUD IN THE INDUCEMENT, CONVERSION, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, LIBEL, AND BREACH OF WRITTEN CONTRACT

Plaintiff Williamson Penn Little ("Penn" or "The Plaintiff"), Pro Se, for his cause of action against one or both Defendant(s) for fraud, fraud in the inducement, conversion, intentional infliction of emotional distress, libel, and breach of a written contract; all under Nevada Revised statutes and relevant case law, based on diversity. Wherefore, the Plaintiff *Pro Se* alleges and states as follows:

### PARTIES

The Plaintiff is an entrepreneur and journalist, as well as a resident of Illinois. The first Defendant, Miss Tierra Layne Baer-Warndahl ("TLBW"), is a newly licensed real-estate agent and resident of Nevada, residing at 8087 Encanterra Road, Las Vegas, NV 89113. However, it is

unclear if she has any income sources or has had legitimate income sources for over one year. The Second Defendant, Dr. Wesley Day, is a physician licensed by Texas and was formerly licensed in Louisiana. Day specializes in the area of anesthesiology. Day also resides in the Dallas Fort Worth, TX "Metroplex" area.

## VENUE & JURISDICTION

Upon information and belief, damages in this case for Defendants' various actions far exceed $75,000.00.

Jurisdiction and venue are appropriate in this Court because of the diversity of citizenship under 28 U.S.C. § 1332. Moreover, the majority of actions that harmed the defendant occurred in the State of Nevada, as well as both written contracts discussed in this civil claim were executed in Nevada.

## STATEMENT OF FACTS

1.  The Plaintiff has known TLBW considerably well for over three years. The Plaintiff met TLBW in the spring of 2017 on a dating application. This was during a conference in Las Vegas. They met *in person* for the first time on June 1st, 2017, when they traveled to Chicago.

2.  The Plaintiff has had an oft sporadic and oft consistent sexual/intimate relationship with TLBW for a period of those three years. The most recent encounter occurred on August 8th, 2020.

3. The Plaintiff has entered into previous settlement agreements with TLBW. He was compensated, *albeit partially*, for the defendant's actions, which disallow the Plaintiff to divulge subject matter underlying provisions of the said contract, which were not violated. The first agreement dated October 9th, 2019, "10/9/18 Agreement," was mutually deemed *completely* null and void due to an admitted violation of a "moral conduct clause" (**See Exhibit A**) by TLBW.

4. The Plaintiff and TLBW memorialized another agreement on September 5th, 2019 ("9/5/19 Agreement"). However, this agreement was done when the Plaintiff was facing a hardship, and TLBW saw a corner in which she could pin the Plaintiff--to exploit his (undue) weakness for financial gain (through the forgiveness of large sums of debt to the Plaintiff.

5. The Agreement provided two benefits to the Plaintiff:

   i. A guarantee that TLBW would work to recoup funds paid JP Morgan Chase (by the Plaintiff), which, while *technically* owned by the bank to TLBW, were, in fact, the Plaintiff's funds.

   ii. A no-contact provision, aside from U.S. Mail, for two years.

6. Only two weeks or so later, the Defendant, TLBW, attempted to contact the Plaintiff, thus violating the 9/5/19 contract's strict no-contact clause. After repeated badgering by TLBW, the Plaintiff answered a phone call on September 16, 2020. TLBW apologized for her conduct in the negotiation of the agreement, claimed she loved the Plaintiff and claimed that due to recent events regarding her loss of employment (due to the closure of the branch of business in which she worked by her employer), she needed $3,000.00 to "survive" and "pay bills" (as text messages reflect).

7. The Plaintiff traveled to Las Vegas, provided $3,000.00 to the Defendant, and besides, TLBW spent time with the Plaintiff and induced the Plaintiff to have sex with her.

8. To date, the Plaintiff has only received a repayment of $1,600.00 of the $3,000.00 loan. Text messages with TLBW confirm this to be true.

9. In November of 2019, TLBW was competing in a half-marathon in Malibu, California. TLBW induced the Plaintiff to drive to Southern California with her. However, as the Plaintiff would later find out, TLBW wished to sleep and asked that the Plaintiff drive the *entire way*. Whereas, earlier in that day, TLBW claimed she wished to "spend time" with the Plaintiff.

10. Upon information and belief, TLBW used the Plaintiff's emotional care and compassion for TLBW to dupe him into being a chauffeur.

11. Additionally, TLBW promised to spend time with the Plaintiff to induce him to drive to Los Angeles. However, upon arrival, TLBW informed the Plaintiff she would not be seeing him over the weekend--and never saw him once.

12. On the same Saturday evening in which the Plaintiff served as TLBW's chauffeur, he demanded $1,000.00 for Chauffeur fees due to the circumstances, and ultimately TLBW paid the fees.

13. However, to attempt to recoup the funds, TLBW constantly said that she would be spending time with the Plaintiff; she induced him to not only *finance* intravenous hydrotherapy sessions for herself and a friend (post-race) but to stay in an expensive Santa Monica hotel, *as well*. She also claimed to be broke, with little to no access to funds.

14. Ms. Baer-Warndahl has admittedly lied on tax returns, concealed illicit revenue, and saved a gargantuan amount of money that she doesn't consider "accessible" due to severe fears of abandonment and attachment issues. So, she asserts her financial insolvency upon information and belief: she is blatantly lying (however, has a dangerous ability to believe those falsehoods herself).

15. Around two weeks later, when the Plaintiff was conducting business in Las Vegas, TLBW apologized and visited the Plaintiff at his hotel, the Palms Casino resort, on November 19th, 2020. TLBW induced the Plaintiff to return the $1,000.00 and also to avoid any sexual encounter because she was, in fact, dating someone else; however, she didn't explicitly make that clear.

16. TLBW has since admitted she is a serial cheater, however, was, as she claimed to the Plaintiff later, wanting to preserve the present relationship with a Dr. Wesley Day, MD ("Day"), of Dallas, TX. However, the Plaintiff used the claim that she "had sex two nights prior with a random guy from Louisiana" then asked, "you would want sex with me after I just had sex with that guy?" In no way for the over six months that TLBW was (at least as purported by Day) with Day did TLBW exclaim she was in an exclusive relationship with Day.

17. Upon information and belief, she was referring to Day; however, also upon information and belief, this suggests TLBW was only there to obtain money owed by the Plaintiff.

18. TLBW stayed the night with the Plaintiff and left the following day. The two parties would not see each other again until the morning of January 4th, 2020. However, TLBW would contact the Plaintiff regularly in that time frame via telephone. Most notably, on December 29, 2019, TLBW claimed she was in Dallas and needed a flight home from Dallas, TX, and attempted to induce the Plaintiff to procure that flight. The Plaintiff stated he would come to visit her in Dallas if she wanted to see him; however, it was clear that it was her responsibility to handle her travel.

19. The Plaintiff chose to resist his urge to bail TLBW out of whatever situation she may have gotten into.

20. A few days later, on a Saturday, January 4th, 2020, TLBW visited the Plaintiff at his hotel room at the Palms Casino Resort in Las Vegas, NV, where he was wrapping up a week's business. TLBW demanded to have sex, and thus, the Plaintiff and TLBW fornicated. Following this encounter, TLBW demanded to "learn to play blackjack like (the Plaintiff)" with the Plaintiff and then attempt to retain income without asserting any personal risk. TLBW demanded a portion of the winnings from the monies the Plaintiff allowed TLBW to play with. Nonetheless, TLBW simply did everything the Plaintiff told her to. By the end of the evening, the Plaintiff allowed TLBW to manipulate her way into keeping over $2,000.00.

21. On Saturday, January 18, 2020. The Plaintiff arrived in Las Vegas to play Golf with a friend that next day and reached out to TLBW to check on her well-being.

22. TLBW asked the Plaintiff to pick her up from the Palazzo hotel in the limo that he was furnished by MGM Mirage's Bellagio Hotel and Casino. TLBW agreed and reluctantly retrieved a belligerently drunk defendant. TLBW made aggressive sexual advances on the Plaintiff with the witness (driver) present in the vehicle mere inches from both parties. So much so, the Plaintiff felt remorse and exhibited such to the driver upon arrival. In hopes of sobering-up the Defendant, the Plaintiff ordered a nurse to administer IV fluids and vitamin B and procured a pizza for the Defendant.

23. Once recovered, TLBW left the hotel after eating a substantial amount of pizza and offered no reimbursement for what she considered gifts from a man separate to that which she claimed to be dating.

24. Admittedly, out of guilt, TLBW returned a small portion, roughly USD 1200.00, to the Plaintiff on the evening of January 19, 2020.

25.     In February of 2020, the Plaintiff would only see TLBW when she wanted to gamble, and this continued to allow her to gain money from the Plaintiff under pretenses.

26.     Once COVID-19 struck, the Plaintiff took refuge in Hawaii. After a few months of little contact, the Plaintiff received a barrage of phone calls from April 1st until roughly April 13th, which ultimately prompted the Plaintiff to leave the Big Island's haven.

27.     On April 4th, TLBWclaimed that she was complacent about her relationship with Day and broke off her "relationship" with the Dallas-based anesthesiologist. From April 5th until April 9th TLBW began to exhibit and communicate to the Plaintiff that she was severely depressed. On April 10th, the Plaintiff chose to board a flight to the mainland, amidst the pandemic, thus placing himself in danger, to assist TLBW, who was voicing suicidal thoughts *and* ideation.

28.     On April 11th, the Plaintiff arrived in Los Angeles, California, and was contacted repeatedly by TLBW, who was extremely intoxicated and voicing wishes to take her own life. Due to the Defendant's childhood history of institutionalization, the Plaintiff believed that a "welfare call" could result in an involuntary commitment to a psychiatric ward, which would be ever-so-terrifying for the Defendant. This is due to purported intense trauma sustained as a teen secluded in an acute eating disorder treatment facility.

29.     At about the same time, the Plaintiff was contacted by Day, who claimed to know facts about the long-term relationship the Plaintiff had with TLBW. Defendant Day was disgusted by the Defendant's behavior and claimed that she appeared to be a compulsive liar. Additionally, Day was insistent that he would no longer be associated with TLBW because, similar to instances (which may only be broadly discussed), TLBW was allegedly far less than faithful today. Through my account: confirmably.

30. Day claimed that TLBW had breached any non-disclosure and don-disparagement agreements between the Plaintiff and TLBW and said, verbatim (to the Plaintiff), "(TLBW) spoke about you like you were the devil," and claimed tha*t she* paid for the $50,000.00 medical bill from 2018, in which TLBW sought help. Nonetheless, on April 13th, the Plaintiff flew to Las Vegas at the request of TLBW and (with her permission, following request) entered the home only to find a suicide note and two sharp kitchen knives with blood on them. The Plaintiff, in immense fear, quickly transversed the stairs to the second floor, where he found a belligerent intoxicated TLBW lying on the floor with bleeding wrists as a result of self-mutilation.

31. The Plaintiff worked to revive TLBW by placing her in the shower and then fully sanitizing all surfaces in the house and gathering laundry to be done. The Plaintiff had to scrub down TLBW personally and physically place her into bed and spend the ensuing two days "babysitting" TLBWuntil a plan could be formulated.

32. Over the course of the next few days, TLBW would sneak alcohol, smoke marijuana, and go so far as to steal over thirty alprazolam pills (for emergency panic attacks), which were prescribed to the Plaintiff by his physician. The latter placed TLBW in grave danger, and she provided no notice to the Plaintiff until the following day that she had done so. Moreover, this is an egregious element of conversion.

33. Ultimately, the Plaintiff was able to work with friends and family to transition TLBW into an appropriate place for making a life change, or so he thought. When the Plaintiff informed Day of her status, Day scrutinized the Plaintiff's boundaries and intentionally decried the Plaintiff upon information and belief. Moreover, a few days following the encounter and "babysitting," TLBW became very grateful, humble, and told the Plaintiff, "you saved my life. I want you to know that."

34. Upon returning home in late April, an investigation that commenced the previous fall resulted in learning before signing the 9/5/19 agreement: TLBW had received a check at her home address. However, the Plaintiff did not know this check. That particular check was the very one that was ultimately meant to be delivered to the Plaintiff.

35. Upon information and belief, as well as a preponderance of the evidence, TLBW endorsed this item over to her roommate "Shema Belhaj" and deposited in July of 2019, three months before executing a "settlement agreement" under false pretense.

36. Upon information and belief, TLBW ultimately used some or all of those amounts of money for personal benefit. Thus, the 9/5/19 agreement was fettered upon its execution. As arguments, in this case, will demonstrate, null and void, opening up TLBW to over $200,000.00 in liability for costs incurred upon the Plaintiff under false pretense. Or, in other words, her masterful ability to manipulate and to dupe the Plaintiff.

37. Regarding the allegations, TLBWnever took an active interest in pursuing the location of the $20,000.00. That amount is due and payable immediately, in the opinion of the Plaintiff.

38. In late April and May, TLBW began to lodge allegations that TLBWcontracted Herpes from Day. After carefully examining the body of the defendant and following a phone call with a reputable "house call" physician in Las Vegas, financed by the Plaintiff, the physician wrote various prescriptions, and following examining photographs of TLBW--determined without a shadow of a doubt that she had contracted Herpes. Shortly thereafter, she claimed to have learned that Day himself was a serial cheater and had slept with over "seventeen different women" while the two were dating.

39. Additionally, throughout June, July, and August, TLBW claimed to be 'doing well' and attempting to get her real estate license. Although her true dream is to become a physician's assistant--something the Defendant, upon information and belief, is afraid of pursuing.

40. Throughout June, July, and early August, the Plaintiff practically gave TLBW thousands of dollars in the process of a "coaching on blackjack" et al. On one occasion, TLBW threatened the Plaintiff if he were not to provide her with winnings. Despite having no 'skin-in-the-game,' the errant TLBW would threaten the Plaintiff with potential public shaming and scenes, inducing fear, and provoking the Plaintiff to provide excess monies earned by the Plaintiff in his sole capacity, ability, and effort.

41. Also, upon information and belief, TLBW used the Plaintiff from March-August 2020 to avoid being alone. Along with inducing the Plaintiff into sexual behavior, TLBW chose to manipulate TLBW into procuring clothing, designer accessories, and spa services (at two locations) in Las Vegas (on being Wynn Resorts Ltd.) to gain these vain items.

42. Without going into intimate detail in light of the "settlement agreements," TLBW has bilked the Plaintiff for over $200,000.00 only to 'gaslight' the Plaintiff when he has attempted to collect. TLBW doesn't own the behavior---she continues that which is destructive and harmful, gaslights, and avoids responsibility for any obligations financed by Plaintiff, under false pretense.

43. In August 2020, as an excuse to avoid payment, TLBW attempted to guilt the Plaintiff into providing TLBW with ample resources--while simultaneously threatening that without monetary support, TLBW would be "forced" to return to exotic dancing or "seeing clients" (referring to sex work)--an alleged 'former' method of her employment and her most

prominent and profitable occupation, admittedly, for years and presumably continuing throughout TLBW's relationship with Day.

44. Suddenly, social media reports show that at no point in that period did the two "split," and after defrauding the Plaintiff; Day and TLBW appeared on a costly trip to the Maldives, suggesting that if TLBW is truly "broke" and Day is "done" (as he purported to the Plaintiff by both, respectively (as recently as May), and that this was all a ruse to defraud the Plaintiff.

45. Upon information and belief, many of the trailing year's charades were strategically planned by the defendants, who are both apparent master manipulators and con-artists. And given their employment situations, with the few elective surgeries occurring as well as the fact Baer-Warndahl earned her license in Real Estate simply a few months ago, they do not have the resources other than those of the Plaintiff to make such a journey for no other reason but unjustly enriched personal satisfaction, to the detriment of the Plaintiff.

## CLAIMS AGAINST THE DEFENDANTS

### COUNT I: FRAUD

The following are fraud elements under NRCP 9; NEVADA JURY INSTRUCTIONS 9.01; and cited in Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety, 121 Nev. 44, 75, 110 P.3d 30, 51 (2005); J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc., 120 Nev. 277, 89 P.3d 1009 (2004); Barmettler v. Reno Air, Inc., 14 Nev. 441, 956 P.2d 1382 (1998); Blanchard v. Blanchard, 108 Nev. 908 (1992); Bulbman, Inc. v. Nev. Bell, 108 Nev. 105, 111, 825 P.2d 588, 592 (1992); Albert H. Wohlers & Co. v. Bartgis, 114 Nev. 1249, 1260, 969 P.2d

949, 957 (1998); Sanguinetti v. Strecker, 94 Nev. 200, 206, 577 P.2d 404, 408 (1978); Lubbe v. Barba, 91 Nev. 596, 541 P.2d 115 (1975).

1. Defendant makes a false representation or misrepresentation as to a past or existing fact;
2. With knowledge or belief by the defendant that representation is false or that defendant lacks sufficient basis of information to make the representation;
3. The defendant intended to induce the plaintiff to act in reliance on the representation;
4. Justifiable reliance upon the representation by the plaintiff;
5. Causation and damages to plaintiff as a result of relying on the misrepresentation; and
6. It must be proved by clear and convincing evidence and be pleaded with specificity.

Upon information and belief, the Defendant TLBW, as well as Day, both qualify in this regard. Day qualifies under the fact that his communications with the Plaintiff contradicted his own actions and benefitted from the Plaintiff's unlawful use of the Plaintiff's resources.

Regarding TLBW, depending on the rulings of this court, it's fair to say that the contractual agreements made with the Plaintiff were done so under pretenses, as much or more egregious than the very actions TLBW sought to cover-up, including inducing the Plaintiff to expend money when he genuinely cared for TLBW's well being by going to extreme lengths to

produce false information. Under the above circumstances mentioned herein, the fraud claim is valid and justifiable.

## COUNT II: FRAUD IN THE INDUCEMENT

The inducement of The Plaintiff by TLBW to execute the contract with the promise to convey the $20,000.00 owed to the Plaintiff, in and of itself, could serve as the definition for fraud in the inducement. Citing *A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.,* 120 Nev. 277 (2004); <u>Lubbe v. Barba</u>, 91 Nev. 596, 598; 540 P.2d 115, 118 (1975), fraud in the inducement consists of the following actions.

1. The false representation made by the defendant;
2. Defendant's knowledge or belief that the representation was false (or knowledge that it had an insufficient basis for making the representation);
3. Defendant's intention to induce the plaintiff to consent to the formation of a contract;
4. Plaintiff's justifiable reliance upon the misrepresentation; and
5. Damage to the plaintiff resulting from such reliance.

Therefore the check cashed and false representation in the inducement of a contract, which conveyed items of value to the Defendant as well (through lessened debts), was a qualification of such characteristics of such a tort.

## COUNT III: CONVERSION

By, as alleged, knowingly conspiring with a friend (and roommate) to cause a $20,000.00 cashier's check to be deposited to a different account, for no other reason than to convert and

hide the Plaintiff's funds from any inquiry he may provoke. TLBW assured and stipulated this was the Plaintiff's money in the most recent written contract; therefore, TLBW committed conversion under Nevada Revised Statutes.

Citing M.C. Multi-Family Development, L.L.C. v. Crestdale Assoc., Ltd., 193 P.3d 536, 543 (Nev., 2008); Evans v. Dean Witter Reynolds, 5 P.3d 1043 (Nev. 2000); Bader v. Cerri, 96 Nev. 352, 609 P.2d 314 (1980); Wantz v. Redfield, 74 Nev. 196 (1958); Boylan v. Huguet, 8 Nev. 345 (1873); In Nevada, the elements for a claim of conversion are:

1. A distinct and intentional act of dominion by one which is wrongfully exerted over the property of another;
2. Act committed in denial of or inconsistent with the rightful owner's use and enjoyment of the property;
3. An act committed in derogation, exclusion, or defiance of the owner's rights or titled in the property; and
4. Causation and damages.

Therefore, the check amounts to conversion by TLBW and other facts mentioned in this complaint amount to conversion by both Defendants. The latter is shown when both, who have reduced incomes as of late due to COVID-19, chose to defraud the Plaintiff, and upon information and belief, utilize his resources to travel on an abundant and luxurious trip to the Maldives when both have little to no income.

**COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

(2020.10.19, Little v. Baer-Warndahl et al - Nevada Federal Dist. Court, Case No. Pending Doc 2)

13

The United States District Court for the District of Nevada stated: To establish a cause of action for intentional infliction of emotional distress, the plaintiff must establish the following: (1) extreme and outrageous conduct with either the intention of or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation. Id. at 1268 (citing Olivero v. Lowe, 995 P.2d 1023, 1025 (Nev. 2000)). In the actions of the Plaintiff this past April 2020, the behavior exhibited by defendant Baer-Warndahl, and the, upon information and belief, apparent charade played by Defendant Day, was simply an effort to provoke the Plaintiff to perform certain duties and tasks, as well as expend funds out of care and compassion for the ailment of the defendant.

The recent rebound, behavior, and response to said "mental breakdown" has resulted in nothing that remotely comes close to what follows such behavior exhibited by a person truly suffering from a severe anxiety or panic disorder.

Nonetheless, the Defendant, TLBW, went so far as to lightly scar her wrists to gain attention and induce the Plaintiff to provide his time and valuable resources.

## COUNT V: LIBEL

Upon information and belief, the Defendant has made outrageous claims to Day, her father Don Warndahl, her mother Misty Forstner, and various financial institutions that are untrue. This includes attempting to use so irrelevant information it is inadmissible content in this court under Fed. Rules Evid. 609(C)1. Defendant TLBW made claims that she paid for a $50,000.00 medical treatment, according to Defendant Day. In contravention of the libelous

claims, the Plaintiff, in fact, paid for this care. The Defendant, TLBW, claimed the Plaintiff stole money from her. In contrast, records demonstrate that, under false pretense, Defendant Baer-Warndahl, in-fact, induced the Plaintiff to expend over $250,000.00 under false pretense for her benefit as well as, more recently, Day's benefit.

To prove defamation, the following elements must be satisfied: "(1) a false and defamatory statement by a defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." Id. at 718, 57 P.3d at 90 (quoting Chowdhry v. NLVH, Inc., 109 Nev. 478, 483, 851 P.2d 459, 462 (1993)); see also Clark Cty. Sch. Dist. v. Virtual Educ. Software, Inc., 125 Nev. 374, 385, 213 P.3d 496, 503 (2009).

In this case, the Defendant, TLBW, made comments that were stated as fact that were undeniably false regarding the Plaintiff, which have been harmful to himself personally and his vocational endeavors.

## COUNT VI: BREACH OF WRITTEN CONTRACT

The breaches of contract which were described herein surrounded many different facets of such agreements. The Plaintiff sought to arbitrate and negotiate; however, the defendant would use extortionate tactics to threaten the Plaintiff to induce him into signing. With no willingness to meet or find a middle ground, claims for breach of contract are present and warranted against TLBW.

In Nevada federal court, it has been acknowledged that while the Federal Arbitration Act ("FAA") governs the substantive law of arbitrability, federal courts will apply state law to determine the "validity, revocability, and enforceability of contracts generally," including whether the arbitration clause is unconscionable. See Kidneigh v. Tournament One Corp., No. 2:12-cv-02209-APG-CWH, 2013 WL 2245920, at *1 (D. Nev. May 21, 2013) (citations omitted).

## PRAYER FOR RELIEF

In total, the Plaintiff seeks "restitution" of $273,455.40 for expenditures made by the Plaintiff which benefited both of the parties. To prohibit further conduct such as this, it is requested that the Plaintiff be awarded $100,000.00 for administrative remedies for the false claims made to institutions and others that damaged him personally and from a business standpoint. Also, the Plaintiff seeks punitive damages of USD 100,000.00, totaling an amount of $473,455.40 in relief in the form of a structured payment of cash consideration or assets held by the Defendant(s). Besides, the Plaintiff prays for any other equitable relief this court may deem and proper.

October 19th, 2020

Chicago, Illinois

Respectfully Submitted,

_____
Williamson Penn Little (Plaintiff, *Pro Se*)
The Bar Nothin' Company LLC
One South Wacker Drive
Suite 200
Chicago, Illinois 60606
(312) 854-7557
Fax: (312) 276-8767
Email: p@pennlittle.com

## VERIFICATION BY PRO SE PLAINTIFF

I, Williamson Penn Little, the Plaintiff herein as well as pro se litigant, of legal age, being first sworn, do state that I attest to the validity of the foregoing Complaint and the allegations therein, and freely state under penalty of perjury that it is true and correct to the best of my knowledge and belief.

_____
Williamson Penn Little

**PENN LITTLE**

*ENTREPRENEUR*
*INVESTIGATIVE JOURNALIST*

One South Wacker Drive
Suite 200
Chicago, Illinois 60606
Office: (312) 564-7557
Cell: (312) 560-0846
www.pennlittle.com
p@pennlittle.com

---

PENN LITTLE
3128547557
THE BAR NOTHIN' COMPANY LLC
ONE SOUTH WACKER DRIVE
CHICAGO IL 60606

1 LBS
DWT: 12,9,1

**SHIP TO:**
US DIST. COURT FOR NEVADA
7024645500
US DIST. COURT CLERK
333 S. LAS VEGAS BLVD.
LLOYD D GEORGE COURTHOUSE
LAS VEGAS NV 89101

NV 891 9-04

1 OF 1

**UPS NEXT DAY AIR**

TRACKING #: 1Z X2A 584 24 9602 5674

BILLING: P/P
DIRECT DELIVERY ONLY
SIGNATURE REQUIRED

XOL 20.10.17    NV/45 34.0A 10/2020*